**Cecil E. Smith, Administrator of Estate of Sandra Leigh Smith, Deceased, Appellee, v. Chicago and Eastern Illinois Railroad Company, Appellant.**

Gen. No. 9,697.

 Opinion filed November 2, 1950. Released for publication November 28, 1950.

CLAIR M. RODDEWIG, of Chicago, and JOHN J. BAKER, of Shelbyville, for appellant.

VAIL, MILLS & ARMSTRONG, of Decatur, for appellee.

MR. JUSTICE WHEAT delivered the opinion of the court.

This is an action based upon the doctrine of "attractive nuisance" by Cecil E. Smith, administrator, for the death of Sandra Leigh Smith, aged 19½ months, whose body was found in an abandoned pond or reservoir, owned by defendant Chicago and Eastern Illinois Railroad Company. The jury awarded plaintiff $7,000 and upon denial of motions for judgment notwithstanding the verdict and for new trial, this appeal follows.

The complaint as amended substantially charged that for more than ten years defendant maintained an artificial pond of water originally created by the construction of a dam in the valley of a natural watercourse, which pond was commonly known as the "C. & E. I. Reservoir" and covered an area of three or more acres; that defendant's railroad tracks are adjacent to the north edge of the pond and that many years ago defendant, through use of a pumping station, used the water for its locomotives, but that such use had been discontinued for more than ten years;

79

that the west edge of such pond extended to within twenty-five feet of a north and south oiled public highway, with no intervening fence or guard; that for more than ten years defendant knowingly permitted the public to go upon its said premises for the purpose of fishing, swimming, skating and other forms of recreation, and had made no effort to protect the public from the dangers thereof; that at some prior time defendant permitted timbers and planks to float upon the water and that children made rafts therefrom; that such rafts later disintegrated but that the lumber and timbers remained upon the surface of the water; that on September 4, 1945, there was situated at the west end of such reservoir, a large timber or piling, a part of which rested on the bank of such pond near the highway and the remainder of which was submerged in the water, which timber was forty yards east of the highway and formed a pier frequently used by fishermen; that the portion of the timber near the water line was slippery by reason of aquatic growth; that there was a beaten path from such highway to such timber; that such condition was known or should have been known to defendant in the exercise of due care; that such water, together with such timber, was attractive to children of tender years; that plaintiff's intestate, aged 19½ months, lived with her parents on the highway one-fourth mile south of the pond; that through no want of ordinary care on her part or that of her parents such child was attracted to such piece of timber, fell therefrom into the water and was drowned. The answer of defendant was substantially a general denial of the material allegations of the complaint as amended, other than the ownership and control of the pond, and affirmatively alleged that defendant kept and maintained a large and visible warning sign near the reservoir on which appeared

the words: "Property of the C. E. & I. Ry. Co. No bathing or trespassing."

Among the assignments of error, it is urged that there was no proof of death by drowning, by reason which there was a variance between the allegations of the complaint and the proof; that this was accentuated by the giving of a plaintiff's instruction assuming the death by drowning; that considering the physical conditions surrounding the reservoir including the log or timber, the same did not amount to an attractive nuisance so as to create any liability on the part of the defendant.

From the undisputed evidence it appears that defendant constructed the dam many years ago and created the reservoir which it still owned and maintained in 1945; that it abandoned its pumping station twenty or twenty-five years ago; that prior to such time it placed in the water ten or twelve timbers about twenty-five feet long, and about fourteen inches by ten inches at the end, to prevent erosion by wave action; that one of these timbers is the one referred to in the complaint, being partly on shore and partly in the water; that no fence or guards ever separated the pond from the highway; that a lane was formed by the use of the trespassing public along the south edge of the reservoir extending from the highway east.

It further appears that plaintiff's intestate lived with her parents on the west side of the oiled road south of the pond, and that the distance from the north line of the home driveway was 310 feet to the north line of said lane; that the timber or log in question was 164 feet east of the center of the highway; that it was sixty-two feet from the home of plaintiff to the highway. It is pertinent to note that the proof shows that as one went north from the home of plaintiff's intestate on the highway, it was necessary

for even an adult to go beyond the north edge of the lane for a distance of twenty or twenty-five feet before one could see the timber or log in question. The evidence is not clear as to the visibility of a child about thirty inches tall, especially where the evidence shows that the view from the highway was at least partially obstructed by grass and weeds.

It further appears that on the day in question the mother of the child was doing laundry work in the basement and noticed the child's absence after a period of two to five minutes; (a day or so before, the child ran away, and went south a quarter of a mile or more to the farm home of a Mr. England, a relative of the Smith's); the mother called to the child and upon receiving no response and without searching the Smith farm buildings or premises, walked south to the England farm, after first looking north on the straight road towards the pond; the road to the south had two jogs in it; the child had never been to the reservoir before but had been wheeled past the highway edge in a baby-buggy. The child's father and mother had lived in the neighborhood for many years and were familiar with the physical conditions surrounding the reservoir property. Upon reaching the England farm, the mother talked with Mr. England, who then mounted a bicycle and proceeded north past the Smith premises and past the entrance of the lane at the south edge of the pond; at a point about twenty to twenty-five feet north of the lane he looked east and observed something floating in the water along the south edge of the reservoir; he abandoned his bicycle, ran south to the lane, then east along the same, and saw the body of Sandra floating on the water; he waded in the water at a depth from between his knees to his hips and recovered the body at a point between ten or fifteen feet from where the timber in question met the water line, or about fifteen or twenty feet from the shore. She was not breathing at the time. He unsuccessfully

attempted artificial respiration and then took the body home. A Dr. Turney was called and pronounced her dead. An unexplained element was presented on the trial when the father testified that he examined the head of the child and found a bruise in front of the right ear which extended two or three inches up and down and one or two inches across. No medical testimony was produced by Dr. Turney or anyone else as to the cause of death—whether as a result of a blow by some blunt instrument, a fall against the timber or by drowning. It does not appear whether or not water was found in the lungs. Likewise unexplained is the finding by the father of his wife's sunglasses near the timber when he first viewed it a week after the death. By way of explanation and beyond the evidence it is argued that the child must have taken the sunglasses with her, and the bruise is explained, without proof, by the theory that the child slipped and hit her head upon the log or timber, and then drowned upon falling into the water. A week after the above incident, the father went to the pond and photographed the scene at the log and also the entrance of the lane, both of which pictures are in evidence. He testified that he saw several foot prints near the log (where the sunglasses were found by him) and as his daughter was barefoot and as the foot prints were about the size of hers, he assumed they were the same. He also said that it had rained during the week and that the water level of the pond had raised two or three inches. It does not appear whether or not the shore area near the log had been visited by none or many until the visit of the father, a week later.

 The cause of the death of Sandra does not appear from the evidence. The complaint alleged drowning and the answer denied this. No medical testimony was introduced. Plaintiff argues that circumstantial evidence supports his theory that because

the footprints of some child were found near the log a week after the death, and the body was found offshore from the end on the timber, the question was one of fact for the jury. Defendant argues that there is no proof as to what happened from the time the mother noted the absence of the child and the finding of the floating body; that the bruise is unexplained; that a body after drowning sinks and does not float. From the record no proof appears as to whether the death of the child was caused by a blow or by drowning. The issue of death by drowning was an essential one made by the allegations in the complaint as amended and the denial in the answer. The failure of the proof to indicate death by drowning resulted in a fatal variance.

■ The prejudicial effect of this variance is emphasized by reference to plaintiff's given instruction Number 2 which stated: "that the rules of law given in these instructions regardless of whether or not the deceased child, immediately before and at the time of the drowning, was a trespasser." By this instruction, assuming death by drowning, the evil was compounded. This amounts to reversible error, and were it the only one, the cause would be reversed and remanded for a new trial. However, a more basic question is presented: Did the combination of the physical relationship between the log or timber, and the pond, as disclosed by the proof, constitute an "attractive nuisance," so as to make defendant liable, even assuming that the child had drowned under circumstances as charged in the amended complaint?

■ As to what constitutes a nuisance attractive to children of tender years, no precise rule applicable to all cases has been announced by the courts of this and other states. Often it becomes a question of fact for the jury, as plaintiff argues in this case. Sometimes it becomes a question of law for the court, as

defendant now argues. The Illinois cases concerning attractive nuisances involving water factors are discussed in many cases, a dissertation on all of which would involve needless repetition. As pertinent may be read that of *Peers v. Pierre,* 336 Ill. App. 134, involving the drowning of a seven-year-old boy in a gravel pit pond, which case, after a discussion of many Illinois decisions, holds that ponds or pools in themselves are not considered attractive nuisances. The leading case upon which plaintiff relies is that of *City of Pekin v. McMahon,* 154 Ill. 141, which concerned a boy nine years of age who drowned in a pond after falling from a floating log. The court stated that the general rule is well settled that the owner of private land is under no obligation to strangers to place guards around excavations upon his land and that the law does not require him to keep the premises in safe condition for the benefit of trespassers. It is then said that an exception exists in favor of children of tender years and that such owner might be liable, if a child, although a trespasser meets with an injury, if the things causing the injury have been left unguarded and exposed and are of such a character as to be attractive to a child. The factors which distinguish this case from the one at bar are apparent from the court's statement of facts: "Here was a half-block of ground in a populous city, bounded on two sides by public streets and on the third side by a public alley; with an opening of some forty feet in the fence upon the street on the south side, and an opening of equal dimensions in the fence upon the alley on the north side; with a causeway running from one opening to the other diagonally across the premises, inviting approach and actually used for passage by men and teams. Upon this half block was a dangerous pond or pit, in which the water was always five or six feet deep, and sometimes fourteen feet deep. Logs and

85

timbers floated about in this pond; and boys had for some time been in the habit of playing upon them in the water. The city authorities had been notified of its attractiveness to children and of its dangerous character. They not only suffered the pond to remain undrained, but the fences around it to be broken down in some places and to be actually removed in others."

It appears that no factual similarity exists between the *Pekin* case and the instant one. Here the pond was considerably beyond the limits of a small community of several hundred. In the case of *Wood v. Consumers Co.*, 334 Ill. App. 530, the facts concerned the drowning of a seven-year-old boy in a gravel pit pond, wherein the court reversed a judgment in favor of the plaintiff. In the opinion appears an excellent discussion of the leading "attractive nuisance" cases, concerning ponds and waters. A reading of this opinion and of the cases therein cited leads conclusively to the finding that the majority rule in Illinois is in harmony with a finding that in the instant case, and as a matter of law, no actionable attractive nuisance existed so as to place liability upon defendant.

The judgment of the circuit court is reversed.

*Reversed.*